EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONUMENTAL LIFE INSURANCE COMPANY,

        Plaintiff,

v.

                                    Case No. 11-14847

CHRISTINA STOKES                     Honorable Julian Abele Cook, Jr.

        Defendant.

## ORDER

This case involves a contention by the Plaintiff, Monumental Life Insurance Company ("Monumental Life"), that the Defendant, Christina Stokes, violated, *inter alia,* her contractual obligations to serve as one of its representatives with integrity and loyalty.[1] This Court has now been presented with a motion for a preliminary injunction. (ECF 5). For the reasons that have been set forth below, Monumental Life's motion will be granted.

I.

Monumental Life, an Iowa corporation with its principal place of business in Maryland, has been authorized by the State of Michigan licensing authority (i.e., Michigan Department of Licensing and Regulatory Affairs) to sell life and health insurance throughout the State. On

---

[1] Monumental Life has sued Stokes on the basis of the following claims; namely, (1) breach of contract; (2) tortious interference with business relationships or expectancies; (3) common law and statutory conversion in violation of Mich. Comp. Laws § 600.2919a; and (4) violation of the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1901, *et. seq.*

September 19, 2005, Stokes - a resident of Genesee County, Michigan - became a licensed insurance agent for Monumental Life, and, thereafter, signed an "Agent's Agreement" with Monumental Life which set forth therein the parties' respective contractual obligations and responsibilities to each other. In signing this "Agent's Agreement," Stokes agreed to the following; to wit,

> (1) immediately return all Monumental Life property including all records or policyholder lists upon termination of employment,
>
> (2) maintain the confidentiality of Monumental Life's confidential or proprietary business information, and
>
> (3) refrain from soliciting or selling insurance products to Monumental Life policyholders for two years following termination.

Thereafter, Stokes began her employment as a sales agent which obligated her to solicit and sell insurance products to residents within the State of Michigan. In 2010, Stokes was promoted to the position of a sales manager with supervisory responsibility over some of Monumental Life's sales agents. However, during the latter part of the year (November 2010), she left her employment with Monumental Life, and joined a competitor, American General Life and Accident Insurance Company ("American General Life") during the following month.

According to Monumental Life, Stokes by agreeing to work as a sales agent for American General Life, violated the terms and the spirit of the parties' Agent Agreement when she allegedly solicited and sold this competitor's insurance products to its policyholders with the aid of its heretofore confidential information. Furthermore, Monumental Life insists that Stokes' alleged misconduct has caused it to suffer an irreparable harm, such as the loss of customer good will and future business.

II.

In deciding whether an applicant is entitled to a preliminary injunction under Fed. R. Civ.

2

P. 65, the court is urged to consider four factors; namely, 1) whether the applicant will succeed on the merits; (2) if the injunction will spare the applicant from an irreparable injury; (3) whether the injunction will harm other persons/entities; and (4) if the public interest will be served by the requested injunction. *See, e.g., Sandison v. Michigan High School Athletic Association, Inc.,* 64 F.3d 1026, 1030 (6th Cir.1995); *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir.2003). However, this Court has been cautioned that these factors should be balanced and not considered as prerequisites which must be satisfied. *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001).

1. Likelihood of success on the merits

Noting that Monumental Life has asserted four claims against Stokes, the court will assess its likelihood to prevail on each of these claims seriatim.

A. Breach of Contract

With respect to the breach of contract claim, the elements of a breach of contract are as follows: (1) a contract existed between the parties, (2) the terms of the contract required performance of certain actions; (3) a party breached the contract, and (4) the breach caused the other party to sustain an injury. *See Green Leaf Nursery, Inc., v. Kmart Corp.*, 485 F.Supp. 2d 815, 818 (E.D. Mich. 2007).

The parties are in agreement that Stokes and Monumental Life were contracting parties to an Agent's Agreement on September 19, 2005. It is the position of Monumental Life that the terms of this Agent's Agreement specifically prohibit Stokes from using its confidential and proprietary business information for her own benefit. Moreover, Monumental Life maintains that (1) Stokes confiscated the confidential information that had been entrusted to her, and (2) acting without

authority solicited its policy holders, all of whom were urged to terminate their then-current insurance policies. As a result, Monumental Life contends that it has lost customer good will, a competitive edge, an indescribable number of referrals, and future business as a result of Stokes' actions.

Stokes disagrees by asserting that the Agent's Agreement, upon which Monumental Life relies, was automatically terminated when she was promoted to a sales manager position on December 21, 2009. The Court notes with interest the following language from the Agent's Agreement:

> The terms of this Agreement shall control my relationship, obligations, and duties to the Company so long as I remain employed by the Company regardless of any promotion or change in title or position unless the Company shall enter into a new agreement with me or modify this Agreement in writing. (ECF 5-4, p.4).

No new agreement or modification has been presented to the court. However, Stokes argues she was working as a Manager at the time of her termination, and therefore, the Agent's Agreement should not apply. Further, Stokes submits that she should have been given a "Sales Manager's Agreement."

In support of this position, she attaches a "District Manager's Agreement" from 2002. (ECF 10-2) to which does not bear the signature of either party to this litigation. Hence, and for obvious reasons, this unsigned document is not admissible and will not be considered by the Court during this litigation. On the basis of the presently existing record in this cause, the Court finds that the Agent Agreement signed by the parties on September 19, 2005 is controlling.

As an alternative argument, Stokes submits that the non-competition clause within the Agent's Agreement only applies if the affected employee voluntarily resigns from her employment. However, this contention is undercut by the following language within the Agent's Agreement: "for

a period of two years from the date of the termination of my appointment as Agent, including my voluntary termination of employment" (ECF 5-4, p.7). This clause makes clear that the covenant not to compete applies to all terminations of employment, including voluntary termination.

Still further, Stokes submits that this covenant not to compete is unreasonable, and in violation of Mich. Comp. Laws § 445.774a which reads as follows:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Under Michigan law, restrictive covenants in employment contracts "are enforceable to the extent that their terms are reasonable with respect to duration, geographical area, and the type of employment or line of business." *Robert Half Int'l, Inc. v. Van Steenis*, 784 F.Supp. 1263, 1271 (E.D.Mich. 1991).

Stokes , who worked out of the Southfield, Michigan office, submits that this geographical limitation is totally unreasonable in that it applies to any area to which " [she has] ever been assigned." ((ECF 5-4, p.9). However, courts have previously upheld restrictive covenants of similar geographic scope. *See, e.g. Radio One, Inc. v. Wooten*, 452 F.Supp. 2d 754, 757 (E.D.Mich. 2006) (restrictive covenant prohibiting radio personality from broadcasting within 75 miles of former employer's transmitters found to be reasonable); *Superior Consulting, Inc. v. Walling*, 851 F.Supp. 839, 846-47 (E.D.Mich.1994) (unlimited geographical scope is reasonable if plaintiff's business is sufficiently national and international in scope.).

The court finds that the geographical restriction, which is applicable to this litigation, is reasonable. The information in Monumental Life's "Agency Listings" is confidential and proprietary information that is essential to its competitive advantage and business prospects. Although the geographical restriction is broad, it is inherently limited because the restriction only applies to Monumental Life policyholders. Stokes is free to work as an insurance agent for a competing enterprise within the State of Michigan; she is only restricted from soliciting, contacting, and selling to Monumental Life policyholders at the time of her employment. The Court finds that the restrictive covenant is sufficiently narrowly drawn, and thus reasonable. In summary, the Court finds it likely that Monumental Life will prevail on its breach of contract claim.

B. Tortious Interference with Business Relationship

Under Michigan law, the elements of tortious interference with business relationships are (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy by the other party; (3) an intentional interference which induced or caused a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted. *Clark v. West Shore Hospital*, 16 Fed. Appx. 421, 430.

Monumental Life argues that (1) it had a valid business relationship with its policyholders, and (2) Stokes was necessarily aware of these relationships. Moreover, Monumental Life contends that she attempted to convince its policyholders to cancel their insurance coverages. Monumental Life claims that the third element of intentionality has been satisfied because it was Stokes who interfered by soliciting and attempting to persuade its policyholders to cancel their policies. In support of this claim, Monumental Life attaches eight "Disbursement Request Forms," all of which

were signed by Stokes as a non-related witness, and authorized the cash surrender of its insurance policies. Finally, Monumental Life argues that Stokes' actions have caused it to sustain the loss of good will, competitive edge, referrals, and future business from its former policyholders.

Stokes counters by submitting that Monumental Life is not likely to prevail on its claim of tortious interference because she did not intentionally engage in illegal, unethical, or fraudulent acts. Rather, she submits that her involvement was only as a witness on the disbursement request forms, all of which were subsequently approved by Monumental Life's district manager. The Court finds this argument unavailing. Under the terms of the policy, Monumental Life is required to follow a policyholder's directive to cancel his policy under the "Surrender Option" provision of the policy. Monumental Life's compliance with their obligations to their policyholders is irrelevant to determining the propriety, if any, of Stokes' actions.

In conclusion, the Court concludes that Monumental Life - after its examination all of the essential elements, as defined by the *Clark* court, supra - has established a likelihood of success on the merits of the claim against Stokes as it relates to the tortious interference issue.

C. Conversion

Under Michigan common law, a conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992). Mich. Comp. Laws § 600.2919a provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

Monumental Life submits that the Agency Listings - alleged to be in Stokes' possession and control

7

- are its property, which she was, and continues to be, obligated to return upon the termination of her employment. In furtherance of this point, Monumental Life asserts that Stokes has retained these listings and is using or directing others to use them in order to sell American General insurance policies. In support of its claim, Monumental Life relies upon a declaration (dated October 29, 2011) by an employee of American General, Nicole Osborn, who has attested that Stokes gave her pages from a Monumental Life "Audit Listing" which contained ostensibly confidential information about Monumental Life policyholders.

In her opposition papers, Stokes rejects Osborn's declaration in its entirety, contending that the statements therein are not true. Without making a determination as to the credibility of Osborn's declaration, the Court finds that Monumental Life is likely to prevail on this claim. While it is unclear whether Stokes remains in possession of Monumental Life's Agency Listings, it does appear that at one time, she may have wrongfully used Monumental Life's confidential information to sell American General insurance policies.

D. Michigan Uniform Trade Secrets Act

According to the Michigan Uniform Trade Secrets Act ("MUSTA"), a trade secret is information that:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy

Monumental Life claims that these Agency Listings contain detailed confidential business information about its policyholders and their policies. Monumental Life asserts that it had taken steps to protect the secrecy of these listings by (1) maintaining them in password-protected computer

8

files, (2) limiting employee access to them, and (3) requiring employees to sign confidentiality agreements. Notwithstanding these efforts, Monumental Life maintains that Stokes has now misappropriated these trade secrets as the result of her current employment with American General.

Stokes insists that she has not used any of Monumental Life's trade secrets in soliciting business. Rather, she submits that it was the Monumental Life policyholders who initiated the communication with her. Here, the Court finds that Monumental Life's Agency Listings constitute a compilation of information that is protected by MUSTA. *See Kelly Services, Inc. v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007) (customer and prospective customer lists constitute trade secrets under MUSTA); *Kelly Services v. Eidnes* 530 F. Supp. 2d 940, 951 (E.D. Mich. 2008) (details of customer contracts are protected trade secrets). Noting that Monumental Life took steps to protect this information, and that Stokes appears to have misappropriated this information, the Court finds that it is likely that Monumental Life will prevail on its MUSTA claim.

2. Irreparable Injury

The second factor in determining whether to issue a preliminary injunction requires the court to assess whether Monumental Life will suffer irreparable injury in the absence of an injunction. The Sixth Circuit has held that "[t]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corporation v. Scott*, 973 F.2d 507, 511-512 (6th Cir.1992). *See also Lowry Computer Products, Inc. v. Head* 984 F.Supp. 1111, 1116 (E.D. Mich. 2007) ( "the loss of consumer good will and the weakened ability to fairly compete that would result from disclosure of trade secrets and the breach of a non-compete agreement does establish irreparable injury").

Monumental Life has sufficiently established that it will be irreparably harmed if Stokes can

continue to breach her Agent's Agreement. This factor balances in favor of injunctive relief.

3. Harm to Others

The third factor in determining whether to issue a preliminary injunction requires the Court to determine whether an injunction would cause substantial harm to others. Courts generally look at the "balance of hardship between the parties." *Superior Consulting Co., Inc. v. Walling*, 851 F.Supp. 839, 848. In that case, the court found that the harm that would be suffered by an employee who is held to his non-compete agreement is less than the hardship to the employer-plaintiff from not enforcing a non-compete agreement. *See also Kelly Services v. Eidnes* 530 F. Supp. 2d 940, 951 (E.D. Mich. 2008). Similarly in this case, Stokes freely entered into the Agent's Agreement.

Monumental Life seeks an injunction that would prevent Stokes from further violating her agreed contractual obligations. Therefore, the Court finds that this factor weights in favor of issuing a preliminary injunction.

4. The Public Interest

Finally, the court must determine whether the public interest would be served by issuing a preliminary injunction. The Sixth Circuit has recognized that the public has a substantial interest in the enforcement of contractual obligations in general, and restrictive covenants in particular. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.* 511 F.3d 535 (6th Cir.2007); *Lowry Computer Products, Inc. v. Head* 984 F.Supp. 1110, 1116 (E.D. Mich. 2007) (enforcement of non-compete agreements is in public interest.) Therefore, the court finds that this factor balances in favor of issuing a preliminary injunction.

III.

As outlined above, the factors weigh heavily toward granting a preliminary injunction in

this case. Furthermore, Monumental Life has a legitimate business interest in preventing its former employees from soliciting clients by using otherwise confidential business information.

Accordingly, the request by Monumental Life for the issuance of a preliminary injunction is granted. (ECF 5). Stokes is enjoined from breaching the Agent's Agreement she entered on September 19, 2005.

IT IS SO ORDERED.


Date: March 28, 2012                                    s/Julian Abele Cook, Jr.
                                                        JULIAN ABELE COOK, JR.
                                                        U.S. District Court Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 28, 2012.

                                                        s/ Kay Doaks
                                                        Case Manager